All right. Let me call the case and then we'll do some introductions. My name is David Ellis. I'm the Presiding Justice of the 3rd Division of the 1st District Appellate Court. I'm joined on the panel today by Justice Margaret McBride and Justice Cynthia Copps. We are calling a consolidated case numbers 1-18-1109 and 1-18-1154, Revisa v. District Rebuilders and Peckar. Could we have the attorneys for the parties who will be presenting the argument today, please introduce yourselves so we make sure we've got you not only on video but audio. We'll start with Ms. Oterizzi. Michelle Oterizzi for defendant Peckar, Your Honor. Peckar. Okay, so I mispronounced that. Mr. Cherish? Michael Cherish for District Rebuilders, Your Honor. Okay. And Mr. Hurley? Christopher Hurley for the plaintiff. All right. Good morning, everyone. Thank you for starting a bit earlier today. We do have some time constraints. So we wanted to give you more time and start a little early. I think you know that we've allocated some time already and communicated that to you. It's been our experience on Zoom, and probably yours as well, that when people are talking over each other, nobody can hear anybody. And so we have chosen, at least in our division, that we will allocate uninterrupted presentation time to the attorneys, which will only be allocated for the purpose of uninterrupted presentation, and then the judges, one by one, will ask questions of that particular attorney before we move to the next presentation. We have indicated to you that each of the three attorneys presenting will get 15 minutes. Mr. Hurley, you may feel like you're getting ganged up on. Rest assured, we have questions and rest assured that we want everyone to have every opportunity to say whatever they need to say. That said, you're under no obligation to use all of your 15 minutes. We would certainly appreciate if you didn't, but you have 15 minutes. When the two attorneys representing the appellants are prepared to begin their argument, please let us know how much time you'll reserve for rebuttal. Given that we're giving you 15 minutes of uninterrupted, I will probably hold you pretty strictly to that, and then we'll take as much time as we need for questions. Do any of the attorneys have any questions with how we're going to proceed? No, Your Honor. Okay, very good. Between the appellants, have you decided which attorney will be presenting first? Yes, Your Honor, I'm going to go first for Packard. All right, Ms. Oterizzi, I'm going to put you on a 15-minute clock. Thank you. Okay, thank you, Your Honor. I'd like to reserve maybe five minutes for rebuttal, if I can. All right. May it please the Court, Michelle Oterizzi for Defendant Appellant Packard. This really should have been a simple case. Mr. Rivera's visa was hurt because there was no safety device to prevent the hood from blowing down on him, and that's undisputed. The evidence is uncontradicted that the specifications for Truck 55, which is the truck at issue here, did include a safety device. It was the Safety Cable and Hook System, which we refer to as the SCH system, and a warning label on the radiator. But by 2012, 15 years after the truck was manufactured, that device wasn't on this truck. The warning label wasn't on the truck. And the uncontradicted evidence shows that there had been a substantial modification to the front of the truck. It didn't have a genuine Kenmore part hood on it. It had an aftermarket hood, which didn't even have the holes drilled in it for the hook on the SCH system. It had a different radiator, which didn't have any safety cable attached to it and didn't have the warning label. That's undisputed. So given those facts, the case really should have been about who was responsible for the modification? Who was responsible for the fact that there was no safety device on the truck in 2012? But plaintiffs really didn't try and answer that question. Instead, plaintiffs tried a different case. Plaintiffs tried the case as if the SCH had been on the truck and had failed. And we had a lot of different theories running around this case, some of them contradicting each other. And we think all of the theories against Packer fail as a matter of law, but if your honors find that there is one or more theories that is viable, the trial itself had so many problems that were entitled to a new trial. And what I'd like to focus on with my time this morning is plaintiff's primary design defect theory, negligent design theory, which is also the basis for the punitive damages award and our argument that we got a verdict that was legally inconsistent. Now plaintiff's primary theory against Packer was that the SCH was inadequately designed for a whole host of reasons. That it would not have prevented the accident, even if it had been on truck 55 in 2012. And that it was so obviously a defective system that it was willful and wanton for Packer to continue specifying the SCH for its T-800 heavy duty truck. This is a theory that the jury never should have heard. Precisely because the SCH was not on truck 55 at the time of the accident, whatever shortcomings it might have had as a theoretical matter could not have caused Mr. Rivez's injuries. And I'll give you an example. One of the things that plaintiff's expert said is that the system was inadequately designed because it was designed so that if the hood started to blow over, it would blow over partially. So that if it was at 90 degrees, it might blow over to 55 degrees before the safety cable engaged and stop it from blowing down all the way. And in his post judgment ruling, the circuit court said that's an obvious defect because if somebody was standing in the wrong place, they could still get hit by the hood. Now that would be a decent argument if that's what happened in this case, but it's not what happened in this case. And therefore, this particular claim defect is completely irrelevant. And we cited in our brief the Jablonski case in the Supreme Court, where the Supreme Court made it clear that a negligent design claim can't be litigated in the abstract, but rather has to be based on the problem that caused the accident. So in that particular case, the court started its risk utility analysis with what actually caused the accident. And that case, as your honors know, was a very odd accident where there was a rear end collision and that caused a wrench in the truck to be propelled through the trunk into the fuel line and the car exploded. And what the court said is that that's the risk you have to look at for risk utility purposes and you have to decide whether that was a risk that Ford, in that case, the defendant in that case, should have understood and should have changed the location of the fuel pump in order to obviate that risk. And so to here, if you're doing the negligent design analysis, you should start with what caused the accident. The absence of any safety device caused the accident. And you can't look at the alleged deficiencies in a device that was not on the truck at the time of the accident. That's irrelevant. And if your honors agree with us on that point, then a large swath of very prejudicial evidence should never have been admitted. And the Wilfill and Watton claim, which is based on this argument, should never have gone to the jury. Now, plaintiffs did try and deal with the causation problem somewhat by claiming that if Packer had used any of the alternative devices that were talked about at trial, that they might have survived the kind of modification that he should hear. And that argument has problems both factually and legally. The factual problem is that that's sheer speculation. The plaintiff's expert did kind of say in the abstract that if there was a hood replacement, some of these devices would be easier to see, acknowledge, understand. But he never came to grips with what was actually done to this truck. He largely ignored what was actually done. We don't know who the mechanic was. We don't know their skill level. And that's all you can do is speculate to say if something else had been on the truck, it would have survived and protected Mr. Ravita. The bigger problem, though, is the legal problem. And that is that a manufacturer only has an obligation to guard against potentially dangerous modifications to its product if they're reasonably foreseeable. And under the case law that we cited in our brief, a modification is not reasonably foreseeable unless two things are true. One, that the operator here, that's the truck driver, could easily modify the equipment. And the second, that he has a known incentive to do so. And the circuit court said there was no known incentive here because there was no reason why any truck driver would remove the safety cable and hook. And of course, there's no evidence that that is what happened, that any truck driver actually removed the safety cable and hook here. Here, it's pretty obvious. And in fact, the only reasonable inference from the evidence is that the safety cable and hook was a casualty of the front end modification, the very extensive modification, which could only have been done by a professional mechanic. And the Pommier case, which we cited in our brief, in the third district, says that when you have that kind of a situation where the alteration was done by a mechanic, that there is no duty to guard against errors that a professional mechanic might make. So that claim fails as a matter of law. And turning then to the question of whether there's a legally inconsistent verdict. Excuse me. The judgment against, the verdict against district rebuilders was based on the jury's finding that district builders should have replaced the SEH system on truck 55. They either took it off and didn't replace it or it was missing and they failed to replace it. And as the circuit court recognized that argument is inconsistent, excuse me, requires a finding for causation purposes that the safety cable and hook would have protected Mr. Gravisa had it been on the truck in 2012. Because if, even if district rebuilders was negligent, if it wouldn't have helped, its negligence would not be causally related to the accident. And that's very I will need you to wrap up if you want to keep to 10 minutes. If you want to cut into your rebuttal, that's your choice. Okay, I'll just finish up really quickly. The That was also at odds with the jury's finding of negligent design, we argued, and the judge said, no, maybe the negligence here was that the cable was negligently designed so it would break in use and that that's what the jury found. But there's no basis for that. Because there's no evidence that the cable ever was used or that it broke. There are no records of it. On on truck 55 and there's no basis factually for anyone's finding against Pecker on that theory. But also, even if there were a basis, it's legally inconsistent with the willful and wanton finding because the only causation theory that plaintiff has on the willful and wanton finding is that the SCH is so bad. That it wouldn't have prevented the accident. And finally, District Rebuilders is going to make this argument to the court tried to fix the inconsistency by saying both parties heading both Pecker and District Rebuilders had an obligation to independently to redesign and design a better mousetrap, if you will, a better safety device. And again, that's not what the Case was tried on not the theory. It was tried on and there is no such application. Thank you. All right. Thank you. So to review. Let's, let's begin with Justice McBride. You have any questions, Justice McBride. Was the jury. Was there any evidence that perhaps the truck. When sold Perhaps was missing this design. So that was an argument that plaintiff Put forth sort of The plaintiff's counsel, I think, said in closing arguments. It really was an issue between District Rebuilders and Pecker and one of them must have done it. But there's no plaintiff on that issue would have the burden of proving that it came away and there's they didn't put in any evidence and the contrary evidence that That it was there is pretty strong because you have the specifications you have checklists of inspections that were done and you have an inspection done by the dealer. And if there's been this sort of Massive You know, divergence from the specifications that you see in this truck. It's, it's totally implausible that no one would have noticed it. Well, could I also ask you I thought there was some testimony that this truck was purchased new from a dealer. Yeah. All right. And then there was also testimony from all these people. I think it's recovery and Rebuilders that no one ever even noticed. An SCA system on this truck at any time. Is that true Um, yes. And what what you have is everybody in the chain denied having done the front end modification and But we have our records to show what it was district rebuilders, they, they admit their records are sketchy. So it remained a mystery throughout the trial, who is responsible for it. But, but there was testimony, though, that this truck was purchased new Yes, after having a record package put on it. And everyone at the well including the driver, but also the mechanic company. Um, Well, but at least the people that worked with Mr revisit said that they were unaware that there was ever any SCA system on this truck at any time. Isn't that true. They said they had the truck from the time they purchased it never sold it for 15 years. There was some evidence before this jury. Although that might go to the one of the manufacturer. Issue. Right, if that would that would be a negligent manufacturing claim. Evidence for it, but it also wouldn't support the kinetic damages claim, which is based on its mind. Well, that's what I have at the center. I'm just, I was just curious. Oh, and the, the, the report about the checklist. That person who actually prepared that checklist did not testify that right. I was like, it was referred to as a squiggly line and that indicated that I think the safety hook and chain or something. Right. One of the categories. Okay. All right. That's all I have. Right. Right. Yes, he was retired. So, All right. Okay. Thank you, Justice Cox. You have any questions. I do justice McBride asked the lion's share of what I would have asked. Thank you, Justice McBride, but I do have a question with respect to Analysis also talked about the ability of risk. And as you admit, this was quite a quirky kind of event that happened in in Jablonski with the wrench or whatever tool was in the trunk actually piercing the gas. Here, though, with as much work at had been done by pay car in terms of developing and designing different types of Mechanisms that would prevent blow back. What did have been in your view foreseeable. By pay car that whatever type of mechanism they use might be at risk of going back. I mean, I'm not sure if the blankey helps you at all. This is so different. Well, your honor. I think the point with your blankey is that You look at what caused the accident and we primarily use the blankey to say that all of the testimony about how the STH was inadequate because of the way it worked because people might not see it. For whatever reason is irrelevant because here it wasn't there. And so all of these purported defects have nothing to do with the question of whether there was a negligent design and It makes it irrelevant. And if you exclude all of that, then you really don't have a Wilhelm Watten claim and you have to have a new trial to see perhaps if there was a manufacturing defect or maybe they should have foreseen that this was Going to this type might be left on the workbench. If there was a front end modification, although I think that the Davis case that we cite and the premier case preclude any obligation to do that, but It's all of this evidence which was extremely prejudicial about what a terrible safety device. This supposedly was was totally beside the point because it had nothing to do with what caused the accident. So if we accept that When truck 55 left pay car. It had everything that the inspector said it had on there with Mine, it would have had the system and there would have been holes in the radiator and something to attach it to the hood. If we assume all that what with respect to the Wilson and wanton claim and I don't know that you address that very much, but was there not notice given to pay car about the Flaws in that particular system. Wasn't there actually some testimony from someone who worked at Conoco who made a report. How do we Well, there was one report from somebody at Conoco that he wasn't hurt, but that the hood fell down because the hook came out of the fiberglass. Maybe the fiberglass was too thin. Not clear if it was a manufacturing defect of that particular truck. But that's one instance and he suggested using a prop rod instead. But of course, in this case, the accident didn't happen because the FCH It pulled out of the hood. It wasn't there. So again, that isn't, they're not, they may be on notice of this possibility of this problem. But even if you credit everything that that plaintiff say and say they can use this theory, there is The claims that were made. And I think there were seven personal injury claims before the truck was manufactured. None of them serious. And then other a couple other warranty claims. You look at the evidence and there's nothing to say what was wrong with them. You couldn't even tell on some of the claims if the FCH was engaged at the time. And some of them involved from the warranty claims involve springs on the hood of a different kind of truck that Weren't letting it go all the way to 90 degrees. So there is no basis in any of the supposedly similar incidents, which we think should have been excluded to say that there was anything really wrong with this design and that it was failing to protect people. So one more thing. Your position, as I understand it, is that when the truck left pay car it had all the bells and whistles, but it was required to have on it. And so, notwithstanding the testimony that Any replacement of any of these parts, your position is that it left here with everything. So it must have been removed, but the truck was brand new. Wasn't the jury entitled to kind of like decide between that somewhat conflicting evidence. Well, I think it's a question of the burden of proof, your honor and and plaintiff didn't prove that we did it. They didn't prove that district rebuilders did it and they can't just say Somebody must have done it and then have the jury pick one because there isn't enough evidence as to either of us to say who did it. So it's a failure of the burden of proof. Thank you. All right. Thank you very much, Mr. Cherish. I have no questions from a soda receipt because I think they've all been covered. Mr. Cherish. I have 1057 would you like 10 minutes I'd like 13 year on you have 13 minutes. Thank you. Driving truck 55, which is owned or was owned by district recovery, not my client district for builders. They are related companies, but have very different businesses. Recovery is in the tow business. They tell everything from motorcycles to large trucks. Rebuilders services vehicles, both those of district recovery and outside entities. Prior to the accident, my client did service truck 55 for both specific maintenance and what's called preventative maintenance specific is something specific breaks and you fix it. Preventative maintenance is a regular course in which they see that the truck is safe to go on the road in a general fashion. Two witnesses testified as to this agreement Bob Zollner was the shock woman for rebuilders and Andy DeJesus, who's the general manager for recovery. As the Zollner he testified, and this all came from their discovery depositions, because as we know, both gentlemen were deceased at the time of trial and almost, almost the entire deposition of each man was read to the jury and I'll have a little bit more to say about that later on in another. It was a handshake agreement that was reached in the yard. Zollner said it comprised of going over the entire truck, change the fluids, grease it, check the brakes, make sure they're safe for the road. DeJesus essentially agreed. They go through everything. They measure the shoes to make sure the brakes are proper. They check the slack adjusters. They get the end front ends up in the air. They check kingpins, tie rods, driveshaft, everything. That was the agreement. Nothing more, nothing less. No one testified as to any further obligations that were agreed to. No one testified that rebuilders agreed to, every time they did preventative maintenance, inspect it so that it met every single specification of the original design by factor. And certainly no one testified as to any Department of Transportation regulations that were somehow delegated to rebuilders from recovery and the rebuilders actually said, yes, we will do that. What did these gentlemen testify to? They testified that the hook and cable device was never on the truck while it was owned by recovery. They testified that it had never been removed, to their knowledge, while it was in the position, while it was in the ownership of recovery. And the hood, to their knowledge, had never been changed while it was in the possession of recovery. Because once again, the truck is in the possession of recovery, its owner, not rebuilders. Rebuilders only possesses the vehicle for the short periods of time during which maintenance is performed. What do we know about where the truck came from? It's assembled by Packer in Chili Cove, Ohio in 1997. It sold to a Kenworth dealer in Tennessee in February of that same year. It then goes to an entity called Miller Industries to put on this specialty design package for the tow truck. It then goes to another dealer in the Chicago area and then, only in December of 1998, does it go to District Recovery, the owner. That's about two years between the time it leaves the line at Packer and the time it goes to District Recovery. A two year gap. I'd like to first address the argument that we believe that the general verdict that was reached against my client is irreconcilable with the response of the Special Interrogatory. And that the court should have entered judgment notwithstanding the verdict. At the request of Packer, the Special Interrogatory was submitted. Very simple. Was the hook and cable blowback safety system for the subject truck inadequately designed by Packer? The jury answered clearly, yes. The jury entered a general verdict against Packer based on, again, fairly simple issues instruction. Did they design the truck at issue without an adequate safety system to prevent the hood from unexpectedly closing? And a manufacturing issue instruction very similar to it. As to Rebuilders, they were instructed differently because their obligations under the oral agreement were different. They were asked to determine whether or not Rebuilders removed the safety hook and cable system and failed to reinstall it. Failed in their maintenance at issue to replace it and permitted the truck to return to service without it. As to both defendants, they were given Long Form 1501 and came to a determination on the issue of proximate phones. The two verdicts cannot be logically reconciled. It would require this court to read, as to Rebuilders, that the following were true. Removed the inadequately designed safety hook and cable system that would not have prevented the hood from closing. Failed in their maintenance at issue to repair or replace the inadequately designed safety hook and cable system. Permitted the truck to return to service without the inadequately designed safety cable and hook system, which would not have stopped the hood from unexpectedly closing. Plaintiff, in its motion practice and before this court, has really not attempted to reconcile this. The trial court relied on two theories, both of which you cannot find in the evidence. You cannot find in the testimony from trial. The trial court believed that Rebuilders had a duty to replace the safety system and that it may have worked, except it somehow fell off or broke. But that doesn't make sense if you consider the fact that the jury specifically found it was inadequate and would not have prevented the accident. Also, there was absolutely no testimony, circumstantial or direct, of this device being there and somehow breaking or falling apart. That is totally outside the record. The trial court also said, well, maybe the jury could find that Rebuilders had a duty to design and install a better system. No expert testified to that. And it's not in the agreement that they reached. Nothing in that agreement said, you know what, we're going to ask you to basically redesign this truck. We're going to ask these truck mechanics to make a better truck for Packer. That was not the agreement. That was not something Rebuilders agreed to do. The duty of Rebuilders is governed by the scope of the agreement. That's clear from Ferentia and Thompson. We also believe that the court should not have allowed the unqualified testimony of Patrick Graziano, an expert witness put forward by the court. Plaintiff presented no expert testimony as to Rebuilders. Although it had no counterclaim for contribution or indemnity, Packer was allowed to present Patrick Graziano to offer various testimony as to the agreement and what he thought should have been done and what he thought the agreement required. First, Graziano is completely unqualified. He's a fireman, not a truck mechanic, plain and simple. His degree is in applied science relating to fireplace, not having anything to do with mechanics, tow trucks, or even trucks in general. He's not a mechanic. He never performed maintenance on a truck. Many years in the past, he had driven, not maintained, a tow truck in a family business. And he admitted that the extent of his knowledge as to a T-800 was maybe he replaced a wiper blade at one time. Nonetheless, Graziano took the stand, and he impermissibly expanded the scope of the Rebuilders' recovery agreement to suit what he thought it should have been. Under Wilson v. Clark, and under applicable elderly rules of evidence, he reviewed and relied on the depths of Zollner and DeJesus to do this. But he basically took it a step further. He redefines the agreement. And he somehow expands it to an obligation by Rebuilders under a federal Department of Transportation regulation, 49 CFR 396-3A, which is interesting. We should take a look at it and see what it actually states. Every motor carrier and intermodal equipment provider must systematically inspect, repair, and maintain or cause to be systematically inspected, repaired, and maintained all motor vehicles and intermodal equipment subject to its control. That regulation does not apply to Rebuilders. They are not a motor carrier or an intermodal equipment provider. It applies to recovery, but that did not deter Graziano. He said, ah, but it was delegated. It was delegated. Why? Essentially because he said, because I said so. He relies on no testimony. He relies on no documents. He said, because I said so, and an expert cannot do that. An expert cannot expand an agreement to his liking simply because he says so. The last element or one of the last elements of prejudice was, even when that testimony is allowed, we are not able to cross-examine him on the basis of that testimony, the two depositions that he revealed. I said almost the entire depositions of Soner and DeJesus were read, but after saying that District of Builders had this obligation to systematically inspect under the regulation, giving the jury the impression that inspections were not done, and had they been done, something would have been different. We were not allowed to cross-examine him on the DeJesus testimony which contradicted this. We were not allowed to read to the jury the portion of the DeJesus testimony which talks about the fact that these trucks in that fleet, and specifically truck 55, had in fact been inspected by the Illinois State Police and the Illinois Department of Transportation, that they had passed these inspections, and that this had been done in spite of his assertion, well, if inspections had been done, things would have been different. That was not allowed. It should have been allowed simply because if an expert relies on a document informing his opinion, which he did, it's subject to cross-examination. He clearly opened the door on that issue. Also, under Illinois Supreme Court Rule 212C, if you read a portion of the deposition, which they did, they read almost the entire thing except this part. If fairness requires the reading of other parts, it needs to be done. That's simply a rule which incorporates the common law rule of completeness. It was not done. Instead, he was able to make the argument, which was simply untrue, that inspections were not done. Rebuilders should have done the inspections. Had this been done, Mr. Revisa would not have been heard. The jury heard testimony which was not only inaccurate, but simply untrue. Finally, as I said before, he improperly expanded the scope of the oral agreement or voluntary undertaking. The law under Forensic and Thompson is very clear. You have a duty to do what you agreed to do, and you have a duty to do that with ordinary care. Experts cannot invent things or add things at their convenience. That is exactly what Mr. Graziano did. That's why my client in the alternative is entitled to a new trial. Thank you. All right, Mr. Cherish. Thank you. You kept your promise on the time. Justice McBride, do you have any questions? A couple. Mr. Cherish, would you say that the jury had to undertake the question of whether there was a duty imposed upon the rebuilders to make sure that there was some safety, hood safety device in place? I think the jury should have been instructed. We submitted a jury instruction on this that was not given. That these are the terms of the agreement. This is what the two men shook hands on in the yard, and they said, this is what we want you to do, and this is what you agreed to do. They should not have considered anything else. That jury instruction, which is patterned on Forensic and Thompson, was not given. And the jury then was allowed to speculate or to improperly accept what Mr. Graziano thought rebuilders had a duty to do, which was beyond the scope of that agreement. With all the testimony there was about the importance of having a hood safety device, because the hoods could, you know, in a gust of wind, just completely collapse. Wasn't that a reasonable sort of bit of information the jury had? Would you agree? I think it's an important piece of information to have with regard to pattern. Okay. Consideration whether or not my client has a duty to ensure that it's there, and that can only flow from an agreement. Okay. So you're saying that keeping the vehicle safe, maintaining it, would never include making sure that there was some kind of a hood safety device on this truck. You're saying that's really not something that would have ever been part of a maintenance or safety kind of suggestion. Not generically. And the jury did hear about the Packer manual itself, its own preventive maintenance manual, in which it fails to specify that you're supposed to do that as a part of their own preventive maintenance schedule. Not only did Packer not specify it, it was never discussed. It was never contemplated. The agreement was between two tradesmen who said, we have to put these on the road every day. Let's make sure they work. Let's make sure the brakes work. Let's make sure the fluids are there. Let's make sure it's greased. Make sure it's safe. Yes. All right. Now, you also mentioned there was a two-year gap between the time that this truck came out of Packer. So it was manufactured in 96 or 97, but it wasn't sold until 1998 to the, to, not rebuilders. Recovery. Recovery, sorry. However, I think the jury was specifically told that this vehicle was sold new. Right? It was a first sale. There had been modifications. All right. The modifications, though, were making it available, making it accessible to tow certain other vehicles or trucks. Right? Wasn't that what the Miller Company did? You put on a specialty tow package, which made it capable of towing certain other heavyweight vehicles. All right. You also heard, though, that they necessarily would perform certain actions on the hood. Okay. Well, that's another question I have. As far as the hood and the radiator, the jury also heard that rebuilders and recovery, that they never did anything vis-a-vis a radiator or a new hood. Isn't that right? That's correct. So do you think the jury may have inferred certain things? Because apparently the Packer testimony, or it came out, that there was a non-Kenworth hood on this truck. There was a non-Kenworth radiator in this truck. And yet, they also heard from rebuilders, or the position was, and removers, that there were changes to the truck, but they were never implemented by rebuilders. Is that true? The jury heard that there was absolutely no evidence from 1998 until the time of the accident that anyone changed the hood. They also heard that at the time that the truck came off the line, Packer, in fact, was in the process of changing the design of the hood. They were getting hoods from different places. One which could accommodate the old safety cable system, and one which incorporated the new system. And that, in fact, there was some question as to what type of a hood, whether it was an Accufab or a Rene, went on the truck. So that's what the jury heard, that there was no evidence to suggest in any way, either direct through testimony, or by some type of forensic evidence, that something had been removed that was originally there, or something had broken and been taken off. Absolutely no evidence. So there were a number of conflicts regarding a company, and I'm not saying what the jury concluded, but they have Packer saying that everything was Kenworth, there was no changes, no modifications when we gave it to the Kenworth dealer. Then you've got Rebuilders saying that we, didn't they maintain this truck from 98 on? No one else did, and yet there was this testimony about, well, it had a different hood, it had a non-Kenworth hood, it had a non-Kenworth radiator. The jury was confronted with some inconsistencies, wouldn't you say? In terms of how it is that this safety recovery system was somehow never noticed by anyone, as it being there or not being there. Mostly not being there. They were confronted with Packer's position that such was the case, but that was not unequivocal. There were several hoods that could have been put on this. All right. One question about the state police reports. You said that the judge erred by not allowing information about those, but wasn't one of the reasons for his ruling was that they were never tendered? Who would have been testifying? What they would have said? Wasn't that part of his ruling? I think the basis of Judge Seneschal's ruling was hearsay. That's what he was concerned about. It's clearly not hearsay. If it is hearsay, well, it's not hearsay in and of itself, but once an expert uses that and relies upon it, he opens the door for cross-examination. Because as we all know, under Wilson v. Clark and cases after that, you can rely on hearsay. Hearsay is commonly put in front of the jury if it's of the type reasonably relied upon by an expert in the field to draw that type of opinion. He did. He was allowed to do that. At that point, it's subject to cross-examination. Right. Thank you. That's all I have right now. All right. Justice Collins? No question. Okay. Just a couple questions for me, Mr. Cherish. Your position is that the evidence showed not only that district rebuilders did not alter the vehicle, replace the hood, replace the radiator, but that you wouldn't have, that that just was not the kind of thing you would have been asked to do. That's correct. It's outside the four corners of the agreement. And there was, was there any, forgive me if I don't remember every witness anymore, was there any testimony from recovery, the company that owned the truck, that they did not alter it? Yes. As I said, I believe I said. I think you did. That was the testimony of Mr. DeJesus, who was the general manager and had intimate knowledge of the truck. He testified very clearly that a hook and cable device was never on the truck when it was owned by recovery, that it had never been removed while it was owned by recovery, and that the hood had never been changed. And in fact, the records of recovery support that. You would think that if you're going to buy a hood, which is not a small item, you're not going to do it for free. And there was absolutely nothing which indicated there had been a hood replacement. There was absolutely nothing to indicate there had been any type of accident or any of this needed to be replaced. And again, you wouldn't do that for free. You get paid. What about Miller? I know that they got out of the case. Was there testimony at trial or evidence at trial about whether Miller did or did not do it? There was testimony at trial as to the custom package that they installed, and there was testimony that that necessarily would include doing certain things to the hood. I believe that was the extent of the testimony in the record. Okay. And you said that you thought there was some evidence in the record that Packer, at the time they were selling these trucks, like Truck 55, were experimenting with different kinds of hoods and things that might not be Kenworth specific? Yes, there were several types of hoods that could have been used. They were using various vents. One was called Rene, one was called Amplifab, and it wasn't a situation where it was entirely clear which vent or this hood came from. Were any of those hoods you just described the one found on the vehicle after the accident? That I'm not sure. Okay. I have no further questions. I'll ask my colleagues, Justice Cox, absolutely. One more for Mr. Charge, if you don't mind. So the SCH system, by all the testimony, involves the hood and the radiator. Right? There's the bolt in the radiator and some attachment to the hood. And interestingly, based on what you just told us, so there's experimentation with all these other types of devices. Do you know whether the other types of devices with which Packer was experiencing also would have involved attachments to both the hood and the radiator? I don't believe it's the same type of attachment. And interestingly, and I think significantly enough, there was no forensic testimony that such had been removed from either the radiator or the hood that was in place. And this is not something that's easily done. It requires tools. It will leave a mark. It will leave a trail. And no one said, Packer said, this is the way we did it. But they presented no evidence to say, here's the proof. All these people don't remember. All these people are saying it never happened. All these people are wrong because look right here. This doesn't lie. There was no such forensic testimony. Thank you. All right. Well, then let's turn to Mr. Hurley. Mr. Hurley, you've been patient. You have 15 minutes, sir. Thank you. I'd just like to address what Justice Cobbs just asked about. The other safety devices which Packer had available at the time they made this truck, all are attached to the frame of the truck. So if the hood, if the radiator, if other parts are removed, that safety device stays with the truck. Those safety devices are much more robust and noticeable. One of the things about two of those three devices is they make a noise when they deploy. So the operator, the first time he uses it, knows that he's got a safety device in place. And from then on, you pretty much expect it to happen. One of the main problems with the design of the SCH hook and cable is that it is not automatic and doesn't deploy in a way that the operator knows about it or even notices it. And so what we know from this case is there are five lifetime truck drivers in the case. DeJesus, Zollner, Raviza, and a guy named Johnson. I guess it's four. All of whom said they didn't even know this Kenworth truck had this hook and cable as a safety system on it. In all the years that those men had driven trucks, none of them even knew about this safety device. And that goes back to why this design is so flawed. It's flawed because it's number one, not automatic. Number two, not noticeable. And that makes it foreseeable that it's going to be discarded somewhere along the life of the truck. The thing about these trucks is they run for a million miles or more and they last for years and years. And PACCAR knows that. And PACCAR knows that this hook and cable device gets corroded, it rusts, and it breaks. And they had multiple reports of that happening even on new devices in their file. So to suggest that this design was ever an acceptable design is something that the jury clearly found it was a flawed design and that the failure to change it was willful and wanton. So it's very important to understand why a safety device is needed on this truck. It's a 200-pound hood. Once the hood tips just past center, it's very easy to tip it closed again. And that's why the wind can blow it closed. And in this case, it can be blown closed with the force of up to 2,000 pounds. So that needs a safety device that's both robust and automatic so that operators don't forget to use it, so operators don't neglect to use it. The trial judge in this case noted this truck, when it was shipped with the safety cable, in the second footnote of his order, he notes that there was nothing about the design of this safety device that they claimed to have provided which did anything to protect anybody. Because it's very clear that it easily can hurt you even if it's working. And that it was demonstrated to not work on multiple occasions. The important point here is that when a manufacturer makes a safety device which is foreseeably removed or altered, as in the Davis versus Packmore case, it is an obligation of them to anticipate that kind of reasonable conduct. And there's two things they look at. Is it easy to remove? The answer is yes. This is very easy to remove. It's just a simple wrench takes it off and throws it away. And is there an incentive to remove it? And the answer is again, yes, because essentially no one really knows what it's doing there. None of the drivers, none of the people that are around these trucks really understood its purpose. So it's not only, you kind of have to look at the videos that are in the record to see how counterintuitive it is to think that you should hook this cable to this hood and that's somehow going to protect you. So when a safety device is basically on its face useless, it's anticipated and foreseeable that it will be discarded, forgotten, or not noticed. And that's, and I'd like to go on then to where Packer comes in on this. Did Packer include this hook and cable when it sold the truck? There's disputed evidence on this. One thing that's very interesting is that this truck was shipped with a safety video filmed in 1996. In the safety video, three safety devices are shown. The prop rod, the safety latch, and the cylinder. So there's three safety devices. The hook and cable are not on the 96 video. That video accompanied this new truck on delivery. So why is there a video that does not include the hook and cable as the safety device? I think it's a reasonable inference that the jury could have made that they were in the transition process and they just forgot to put this device on this truck and it got shipped with no safety device. If that's the case, that's explained by the fact that this safety device is so insignificant, it's very easy to see how some person in the factory would forget or neglect to put it on because it's such a poorly designed device. In addition, the other devices would have been attached to the frame. So there's really no chance that they're going to be forgotten. Finally, we have warranty records on this new truck. So really all PACCAR has to rely on to say that they actually put a device on this is to say, well, our records show that. But their records also show that they checked the steering and the paint on the truck before it went out. And the records also show that a few days after it arrived at the dealer, it had to be sent back for warranty claims because the steering was not properly adjusted and the paint was wrong. So the squiggly line suggests that they inspected those topics. I think there's an inference that can be made that the inspection wasn't done properly. Because as I think the justices have pointed out, there's no evidence that anyone took this off the truck and there's no evidence that it was actually ever on the truck. But if it was, it's quite foreseeable that it was removed because its design was so substandard that it was taken off. So we know that PACCAR went out and got a patent in 1994 and it specifically stated that this design was faulty because of the fact that it allowed the vehicle to be shipped back halfway before it deployed. Also that you could run into trouble finding it at night, you could burn your hands on it, or that the operator could just forget to use it. So for all those reasons, an automatic system was an enhancement. So they designed it, they manufactured it, they installed it on their other trucks, they made a video about it, they shipped the video with this truck. But now they claim, oh, but we sent it with our previous design, which we agree from our patent is fatally flawed. So I think the jury basically concluded that this design was so abominable that it did not and never should have been used. And that's the exclamation point on that is the first witness in the case, a guy named Greg Regal, who was almost killed by a hood on one of these trucks. And who testified that, you know, with a high school education, he went to his garage and made a safety device, which he installed on his truck, and then Conoco, a major corporation, installed on its whole fleet of trucks. Because the design of the hook and cable was simply so bad. And the reason this is an appropriate punitive damage case is because PACCAR knew this in 1991. They knew it was a safety hazard. The documents couldn't be clearer. There were prior incidents. And the knowledge that it was a substantial safety hazard and a defective design, and the fact that there were feasible, inexpensive, manageable fixes to it, takes this away from Jablonski and makes it a case where the deliberate choice to favor the cheaper design over the more expensive, robust design, which would have stayed with the truck, even if this supposed modification took place, is really the reason the jury found willful wanton conduct here. The last point I'd like to make, and I'll ask if there's any questions, is PACCAR had five different product safety managers on this case. None of them. None of them knew about the Conoco letter or Greg Regal's letter or the other incidents where people were almost killed or injured by this truck, which, as I said, comes down with 2,000 pounds of force. And the fact that the corporate side kept the safety side out of the discussion is, I think, one of the main reasons that there was a punitive award given here. Because it was a deliberate choice, a corporate choice, to prefer the cheaper safety device over the one that clearly would have prevented this incident from ever happening. I don't think I have anything else to present. I know I can't reserve a bottle, but I would. Thank you very much, Mr. Hurley. Justice McBride, any questions? Yes, I have a question. Mr. Hurley, you've said that the evidence almost overwhelmingly showed how flawed this design was from the get-go. Correct? Yes. All right. Now, if it was so flawed, how does Rebuilders then have some kind of an obligation to actually come up with a design? And also, in light of the fact that so many people that worked on the truck or drove the truck weren't even aware that there was, you know, a mechanism to prevent a hood from falling on someone's head. Yeah, it's a fair question. I think that the answer really is answered with our first witness, the guy Greg Regal. So, Greg Regal is a guy who saw that there was a problem and, with a high school degree, created a quick fix. Now, in this case, Rebuilders had the obligation to make sure the truck was safe to be on the road. That was their agreement. And they also had access to the operator's manual, which showed that there's a safety device for this hood. And you can really see, I mean, we can go out and open the hood of the truck. It's quite obvious there needs to be something. So, I think the jury weighed it. They said, all right, we're going to compare what Regal and Conoco did, which was jump all over it as soon as they noticed it, and we're going to compare what Rebuilders did, which was nothing. And they gave them 25% or 20% fault, which I think was reasonable. Do you think there was anything in this oral agreement, and that's all there was, that would require Rebuilders to come up with a design that was safe and adequate? Especially in light of the fact that everybody testified they weren't even aware that these kinds of mechanisms were on these enormous trucks. Yeah, well, it's true they did testify to that. And I think what the jury would have said about Rebuilders is they have to do what's reasonable. And if there's no safety device on the truck, call the manufacturer, get the safety device, find a new one, or create your own. But your obligation under the contract is to make sure the truck is safe to be on the road. That was repeatedly testified to by Redwanski, by Zoellner, by DeJesus. The truck has to be safe to be on the road, which includes if the truck breaks down and you have to open the hood, the safety device has to be there to protect the operator. And you think that the agreement to maintain the truck and make sure it's safe would go as far as to require coming up with a design that was, you know, I'm just trying to, you think there was an obligation to come up with a design? That's not the only thing they could have done. They could have taken it out of service, contacted PACCAR, said, hey, what is the deal with keeping this hood up? And what do you have? They didn't have to actually go redesign the truck. I agree with that. But they certainly could have done that, because it's not that hard to do. The jury can decide whether reasonable care for professional truck maintainers requires basically putting a hard stop rod in there to stop it. So that's a reasonable thing the jury could expect. That's not the only thing they could have done. They could have taken it out of service and asked the dealer or the manufacturer, hey, what do you have for this? Because we need something. Did I answer that? Justice McBride? Yeah. I have no other questions. Sorry. Okay. Thank you. Justice Combs? Yes. And mine is just a really general one, because I don't recall if you touched, Mr. Hurley, very much on Ms. Otter Bussey's and Mr. Cherish's position with respect to the verdicts being inconsistent. Would you speak very briefly on that, please? Yeah. Again, on the issue of the inconsistency, I think that, again, the jury could say, you know, clearly it's a badly designed truck, and that was a proximate cause of the injury. A professional maintainer of trucks who holds himself out as a professional maintainer of trucks who agrees to keep the truck safe has an obligation to know what the manufacturer had to offer. I mean, I suppose if we had seen that they had ordered a hook and cable and put it on the truck, they may have been able to argue, hey, we did everything we could. That's all we knew to do. They didn't even do that. So I think that's the reason the jury apportioned some fault to them. But again, it's really illustrated by the testimony of Greg Regal, where when you're confronted with something that's unsafe in operation, you can't just blame it and wait for the accident and then blame the manufacturer. You have to intervene to the extent necessary. If that means just taking it out of service until a proper safety device is on there, then so be it. And if they had ordered a hook and cable and put it on, that would have maybe enhanced their defense and allowed them to escape liability. But really, they claim to be professional truck maintainers, keeping trucks safe, and did nothing to make sure this truck was safe. Are there any other questions for me? I think you're on mute. You're saying Justice Cox is indicating she has no more questions. Mr. Hurley, it seems pretty clear here that as to Packer, there are alternative theories of recovery. It's almost as if there are two separate trials going on. In one theory of recovery, the theory of the plaintiff is that Packer never put the CSH system in at all. So they just sold it, put it into commerce, if you will, without any safety protection at all. And I think that that's a pretty straightforward theory of liability if that's what the jury found, because you could say you have to put something in to protect the hood from falling. The other theory against Packer is, okay, maybe they did put it in, and maybe somebody took it out. And it seems to me the best evidence that Packer has of that, it's not the only evidence, but the best evidence they have is that it certainly appears that the radiator and hood that were on the truck at the time of the accident did not match what was on the car when it was put into commerce by Packer. Now, you're free to comment on that because you may disagree with that, but it seems to me like... And then your theory of liability becomes a bit more complicated. It's one where you have to say, well, if it was taken off, it was probably taken off because either people didn't know it was there, because it was camouflaged, or because it was not durable. It wouldn't last as long as a truck that's going to drive a million miles. Which gets a bit speculative. You know, I'm not necessarily saying it's not a viable theory, but it's certainly a much tougher road for you than the first one. I take it, and I believe the circuit court even expounded on that, and I think the circuit court even said, and maybe you did too, sir. I think the circuit court even said, even if it had been on there, the hook and rod, the same accident would have happened. And that's another theory that could have happened, which I think Ms. Sotorizzi was challenging as legally tenuous. So I have a couple questions for you on that. The first question is, would it be fair to say that you argued the first theory much harder than the second? I mean, did you argue that second theory? I know there was evidence put in about the defective nature, but did you argue to the jury both theories of liability? Yes. I mean, without having my closing argument in front of me, I think that clearly we argued it was a defective design. And because the design was so fundamentally inadequate that it was foreseeable that it would be removed, discarded, lost, or broken. So we clearly argued that the design was so bad that it was inevitable that this was going to be. And the fact that none of the guys that use the trucks ever even knew about the design for this device. So we clearly argued design was flawed. And then we clearly argued that it may have been. I mean, I didn't really know how the jury was going to decide the case. And to this day, I don't know exactly what their reasoning is. But it's also possible that they failed to include the device on a truck when shipped. And that's shown by the fact that they did ship the truck with a video that shows different devices. So it's, I think, reasonable to infer that they neglected to put on the hook and cable as well. Okay, so let me press you just a bit on that and make sure I've got all the evidence from both sides on this. What Packer would argue is that there was a few things. One is that there was an inspection done by Packer. I think they said 10 to 12 different people were looking at this. And we've got the inspection reports. And we've got, of course, the squiggly line that you showed us. But even the inspector with the squiggly line, he did identify a number of things. I think there were like 20 things in his report, which I would think would cut a little bit against the idea that he just phoned the whole thing in. That he just, you know, scratched it off and just threw it into some file and didn't even really look at the product. And I think Packer would also point to the fact that Kenworth did its own inspections. And, in fact, on Truck 55, Kenworth, as you noted, as everybody has noted, Kenworth actually caught a couple things, at least, about the truck, including the hood and including the paint. And, you know, Kenworth had every incentive to make sure that this had everything it needed on it. And none of those inspectors for either Kenworth or Packer said anything about the absence of the hook and rod. And the only other thing that I'm aware of would be, I believe, and you tell me if I have this wrong, I believe that Packer shipped or sold or whatever you want to say, two other trucks just like Truck 55 at the same time. And those trucks did have the hook and rod system. I'm less certain of that last fact, so I'll give you the floor here. Yeah, so what we know is they have documents from the time of the manufacturer, which, as you can see, has a squiggly line. And we know that through that line is the hood safety cables, but also through the line is the steering system. And we know that when the truck got to its dealer, the steering system was detected to be incorrect and had to be sent back to the manufacturer. So they have some evidence that they sold this with the hook and cable. We have quite a bit of evidence that it didn't come with the hook and cable. And that is the fact that the one and only owner of the truck said that nobody ever touched it. The truck's never been in an accident. Why would you change out a radiator on a truck that's never been in an accident? Why would you change out a hood on a truck that's never been damaged? So there's not a single person that can corroborate these documents. So we also have evidence that they shipped the truck with a video that shows parts which weren't on there. According to the video, a 1996 video, they should have had a prop rod on this truck, a red prop rod. They didn't have it there. So now they're saying, oh, well, we should have had the hook and cable there. And then the question is, OK, well, why did you send a video that has a prop rod? And they say, oh, that's just a mistake. Of course, it's not a mistake. They don't really know what they did at the time they shipped this. And the fact of the matter is there's plenty of evidence to suggest that nothing at all was sent out with it. And by that, I mean all the people that worked at the district. OK, so what do you make of the fact that there was a non-Kenworth specific radiator and a non-Kenworth specific hood on the car at the time of the accident? I'm not convinced that's accurate. I mean, they've got multiple plants. They may have production shortages where they're running low on parts and they get a substitute part in. I don't know the answer to exactly why they claim that this is a different hood. I do know that it wouldn't matter if they had mounted to the frame one of the proper safety devices because the proper safety device would have been there whether it was the same hood or not. It's really the design of the safety device that got us into this mess because it's so easy to remove and it's so inconsequential that nobody knows why it should be there. If you had sold it with the one that the video requires, one of the three that the video requires, it would have been there regardless of whether the radiator was changed and regardless of whether the hood was changed. And we have expert testimony to support that. So, Packer attempted to submit a special interrogatory on the question of whether the truck was equipped with the safety device at the time it was sold. Why wasn't Packer entitled to pin the jury down on whether or not the SDH system was in the truck at the time it was put into commerce? I mean, that would have certainly narrowed down the issues. At this point, I don't think we aren't really sure what the jury thought. Why should that special interrogatory have been denied? Well, there's a number of reasons. First of all, I do think we know what the jury thought. They checked off that the conduct was willful and wanton and they checked off that the safety hook and cable was defectively designed. So, we know that's the direction they headed. At least that's one of the directions they headed. I'm talking about in terms of whether it was on the car at the time it was sold. We don't know that. Well, I mean, I think it's a general verdict. So, they could have found that it wasn't there when it was sold and they could also find that it was defectively designed. So, they didn't have to, they could have found either and it doesn't really matter as long as they found one of them. Well, I understand that, but the theories of liability are so different under the two standards, under the two different arguments. Why wasn't Packer entitled to get an answer to that question? Well, I'll start with the first special interrogatory and then deal with the second. The first one says, was the T-800 in a defective and unreasonably dangerous condition at the time it left Packer's control? I'm sorry, counsel. I hate to interrupt you, but we don't have a ton of time. I'm not asking about that one. Can you focus on the other one? Okay, the one that says, was the subject T-800 equipped with a safety cable and hook? So, there's at least two reasons why this was inappropriate. One, it's a compound question in that it's asking, was it equipped and would it prevent the hood from closing? So, there's two questions there. Compound questions are clearly inappropriate. Number two, and most importantly, I think it's not dispositive because a yes answer allows you to still find that even if it was equipped with this, a design negligence theory is that it's foreseeable that it would be modified or removed. And so, just saying yes, it was on here or saying no is not a dispositive question for purposes of a special interrogatory. So, it's really useless in that regard because a viable theory for plaintiff is that a product design was used, which is foreseeably modified. That's not answered by this interrogatory. Okay. And I think just, I mean, I think centering on that topic, it's really important that the court appreciate how when a design is this weak, it's foreseeable that it's going to be forgotten, taken off, broken and not replaced, or just not used. And so, and there's plenty of evidence that that was the case with this design. And that's the reason it's foreseeable that it wasn't on this truck when it was used. A design that was attached to the frame would have been there and would have prevented this accident. If the special interrogatory had been submitted and the answer from the jury was that the SCH system was not attached when it was put into commerce by Packer, do you have a punitive damages case? Yeah, I think I do, because they also said that the design was Wolf One. The design was, they check on the verdict form. Well, the special interrogatory that was given says that it was a bad design. Yeah, I know. We have both. Well, I think that it's a bad design because, again, if they forgot to use it at the factory, that really illustrates my point, which is it's such an inconsequential piece of equipment. They forgot it even at the factory. It's kind of hard. Manufacturing, right? Well, no, it's both. Because the design is so weak that even the manufacturer, it's an afterthought that they forgot to put it on. So I don't agree that it's just a manufacturing flaw. I believe it's both a design and a manufacturing flaw, and we prove both. Look, the exhibit shows it pretty clearly, but the stop rod is a big red thing. You can't miss it. You can't forget putting it on. The other devices are very robust and very noticeable. You just don't notice, you can't forget to put them on. It's very understandable why they forgot to put this on. It's just, I mean, even the people that use trucks don't know what it's for. Okay. Okay. Thank you, Mr. Hurley. I have no further questions. We're getting close to noon. Are there any other questions from the judges? Follow up? Okay. Ms. Sotorizzi, I think I promised you four minutes. You don't have to use all four if you don't want to. I think just as a factual matter, Mr. Hurley said he's not convinced that these were non-Kenwood parts, Kenworth parts. But the testimony on that, he didn't put on a witness who contradicted the testimony of the Packer employee, who went through pages and pages of differences, and it wasn't just the hood. It wasn't just the radiator. The parts that Kenworth has, it does outsource them, but they have to be made to Kenworth specifications, and they have a part number stamped on them, and this hood didn't have that. And the radiator wasn't made to specification. So I don't think there's really any question but that these were what people call colloquially knockoff parts. Also, I think Your Honor is absolutely right that at the very least, the judge should have given a special interrogatory to the jury to find out what it thought, what it believed, whether it had left the plant. And it does make a difference. That is a negligent manufacturing claim. Even plaintiff's expert said, if you inadvertently left it off and it was specified, that's a negligent manufacturing claim, and that doesn't give you a basis for punitive damages. So it was important to know what the basis of the jury's decision was. I think that also Mr. Hurley talks about the fact that they had a video which was shipped with the truck. Nobody ever looked at it, but it was shipped with the truck, which showed three other safety devices and not the one that was specified for this truck. And we hear some speculation that maybe they were in the throes of changing things and so they forgot or they didn't put it on. But the fact is, the uncontradicted testimony is that the safety cable and hook system continued to be used on T-80 through the date of trial. And they manufactured almost a million trucks with that safety system on it. Obviously, some people didn't know how to use it. If you looked at the owner's manual, you could figure out how to use it. And Mr. Rago and Conoco, he was using it. Yes, apparently it broke off. Sounds like a manufacturing defect. But he's the only one. All the other claims with Mr. Hurley says people were almost killed. There's no indication that people were almost killed. Hooks fell down, but you can't tell why they fell down from the claim records. So there's really no basis to say that Packard knew that this was a dangerous safety device. And I have to take exception to the argument that was made to the jury that they were saving pennies and putting economics over lives. All that the plaintiff did here was take a look at the difference between the cost of the SEH system and the cost of other things and say, look, one's a little bit more expensive than the other one, maybe $40, $50 more expensive. But there's no indication that that was why Packard decided to keep the SEH. Its engineers thought it was a good system. They used it for many years with very few claims being made. And so even if they somehow get through the punitive damages, there's no basis for finding a willful and wanton misconduct. All right. Thank you, counsel. Do the justices have any questions? Justice McBride? No, no questions. Justice Cobbs? No, no questions. Okay. Thank you very much, Ms. Oterizzi. Mr. Cherish, I think you gave yourself two minutes. Thank you, Your Honor. Very briefly, Mr. Hurley described the safety system that Packard designed as useless. I agree. And the jury agreed because the special interrogatory confirms that. The special interrogatory was framed such that they were inquiring as to whether or not that system for the subject trunk was inadequately designed. The jury answered yes. You can substitute the word inadequate for useless, but in essence, that's what they designed or that's what they decided. Then you have to ask yourself if that's what they said, and they go on to find in their verdict against Packard that it would not have prevented the accident. How is a matter of law under the long form of 1501 can there be proximate cause to sustain a verdict against my client? How can you be held liable for failing to install a useless device that would not have prevented the accident, even if you extend the agreement as Mr. Graziano did? You can't. There was a lot of discussion about it was the agreement that it would be safe to be on the road. Well, I would submit that you have to read that logically within the context of what those two gentlemen agreed to when they shook hands in the yard. This wasn't a 20-page agreement that was drafted by lawyers. They were industry guys who knew what they were doing, knew what they expected. There was never any indication that recovery came back to Rebuilders and said, hey, why aren't you doing this? Why aren't you going back and looking at the manual and calling Packard and making sure that all 150-some pages of the manual are complied with? The reason is that Rebuilders was doing exactly what Recovery asked it to do, and that's what they're required to do under forensic. No more, no less. Finally, I believe there was reference to the fact that they could have taken the vehicle off the road. Not my client. My client's not the owner. Recovery could have taken the vehicle off the road any time they wanted to. I'm Rebuilders. I don't own the truck. I can't do that. Thank you. Thank you, counsel. Justice McBride? No, no questions. Okay. Justice Cobbs? No questions. Thank you very much, everyone, for your arguments. They were outstanding, and so were your briefs. It's a very interesting case that we will take under advisement. And thank you for your patience today with our Zoom technology. It will be put on the court website either later today or tomorrow. With that, we will stand adjourned. Thank you.